# 24-2509(L)

To be argued by:
SARAH BAUMGARTEL

_____
_____

United States Court of Appeals
For the Second Circuit
_____

Docket Nos. 24-2509(L); 24-2513(CON); 24-2514(CON); 24-2523(CON)
_____

UNITED STATES OF AMERICA,

*Appellee,*

-against-

ERIC GOLDSTEIN, BLAINE ILER,
MICHAEL TURLEY, BRIAN TWOMEY,

*Defendants-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT ERIC GOLDSTEIN**

_____

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8772

Sarah Baumgartel,
Ashok Chandran
*Of Counsel*

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

QUESTIONS PRESENTED .................................................................................3

STATEMENT OF THE CASE.............................................................................4

STATEMENT OF FACTS....................................................................................6

  A. Eric Goldstein's Background and History of Public Service ...................6

  B. Goldstein's Beef-Importing Business Venture with Turley, Iler,
    and Twomey (RMSCO) ..........................................................................8

  C. Somma and SchoolFood .......................................................................13

  D. The Criminal Allegations .....................................................................14

  E. The Trial...............................................................................................16

  F.  The Conflict-of-Interest Evidence .......................................................18

  G. The Defense Case..................................................................................27

  H. The Verdict and Defendants' Motions for Acquittal and a
    New Trial ...............................................................................................27

  I.  Goldstein's Sentencing .........................................................................29

SUMMARY OF ARGUMENT ..........................................................................33

ARGUMENT.......................................................................................................35

I.    The district court erred by admitting extensive evidence related
    to conflicts of interest..............................................................................35

  A. The Constitution and Rules of Evidence prohibit the admission
    of irrelevant and unduly prejudicial, confusing, and misleading
    evidence. ................................................................................................36

  B. The conflict-of-interest evidence should have been excluded. ..............38

    1.  This evidence had limited, if any, probative value.............................39

i

2. The conflict-of-interest evidence created a significant risk of juror confusion and undue prejudice. ...........................................43

3. Admission of this evidence was an abuse of discretion....................48

C. The admission of this unduly prejudicial and confusing evidence requires a new trial.........................................................................49

II. The defendants were entitled to acquittal on all counts because of the legal insufficiency of the evidence, and the district court erred by admitting inflammatory food-safety evidence. ........................53

III. The honest services fraud statute is unconstitutionally vague. .............54

IV. The Court should find the evidence insufficient as to Hobbs Act extortion because the government asserted only a bribery scheme..................................................................................57

V. The district court's erroneous calculation of the "value" of any bribes warrants resentencing.........................................................61

A. This Court reviews the procedural reasonableness of sentences...........62

B. The bribery "value" calculation should not have included RMSCO's legitimate expenses and amounts paid to third parties........62

1. The Guidelines provide for offsets based on legitimate business expenses of legitimate companies. ........................................63

2. RMSCO was a genuine company that made payments for legitimate business expenses and to third parties. ................................65

C. Because these offsets would lower Goldstein's Guidelines range, he should be resentenced. ............................................................66

CONCLUSION ..................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrew v. White,*
604 U.S. ---, 2025 WL 247502 (2025) ............................................... 36

*Connally v. General Constr. Co.,*
269 U.S. 385 (1926) ........................................................................... 54

*Evans v. United States,*
504 U.S. 255 (1992) ......................................................................58-60

*Gall v. United States,*
522 U.S. 38 (2007) ............................................................................. 67

*Huddleston v. United States,*
485 U.S. 681 (1988) ........................................................................... 37

*Johnson v. United States,*
576 U.S. 591 (2015) ...................................................................... 54, 55

*Kelly v. United States,*
590 U.S. 391 (2020) ........................................................................... 33

*Kolender v. Lawson,*
461 U.S. 352 (1983) ........................................................................... 54

*Kotteakos v. United States,*
328 U.S. 750 (1946) ........................................................................... 49

*McDonnell v. United States,*
579 U.S. 550 (2016) ........................................................................... 40

*McNally v. United States,*
483 U.S. 350 (1987) ........................................................................... 55

*Molina-Martinez v. United States,*
578 U.S. 189 (2016) ........................................................................... 67

*Ocasio v. United States,*
578 U.S. 282 (2016) ........................................................................... 60

*Old Chief v. United States,*
   519 U.S. 172 (1997) ................................................................ 37, 46

*Percoco v. United States,*
   598 U.S. 319 (2023) ................................................................ 40, 55

*Silver v. United States,*
   141 S. Ct. 656 (2021) ..................................................................... 59

*Skilling v. United States,*
   561 U.S. 358 (2010) ............................................................... *passim*

*Snyder v. United States,*
   604 U.S. 1 (2024) ................................................................... 33, 40

*Sorich v. United States,*
   555 U.S. 1204 (2009) ..................................................................... 57

*United States v. Aboumoussallem,*
   726 F.2d 906 (2d Cir. 1984) ........................................................... 46

*United States v. Al-Moayad,*
   545 F.3d 139 (2d Cir. 2008) ........................................................... 50

*United States v. Anderson,*
   517 F.3d 953 (7th Cir. 2008) .......................................................... 64

*United States v. Avenatti,*
   No. 22-50301, 2024 WL 4553810 (9th Cir. Oct. 23, 2024) ............................. 66

*United States v. Bennett,*
   839 F.3d 153 (2d Cir. 2016) ........................................................... 67

*United States v. Blitz,*
   151 F.3d 1002 (9th Cir. 1998) ......................................................... 64

*United States v. Butler,*
   970 F.2d 1017 (2d Cir. 1992) .......................................................... 62

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ........................................................... 62

*United States v. Confredo,*
    528 F.3d 143 (2d Cir. 2008) ................................................................. 67

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011) ................................................... 45, 49, 52

*United States v. Eaglin,*
    913 F.3d 88 (2d Cir. 2018) ................................................................. 62

*United States v. Figueroa,*
    618 F.2d 934 (2d Cir. 1980) ........................................................ 37, 48

*United States v. Glick,*
    142 F.3d 520 (2d Cir. 1998) ............................................................... 64

*United States v. Jones,*
    16 F.3d 487 (2d Cir. 1994) ................................................................. 45

*United States v. L. Cohen Grocery Co.,*
    255 U.S. 81 (1921) ............................................................................. 55

*United States v. Lopreato,*
    83 F.3d 571 (2d Cir. 1996) ................................................................. 62

*United States v. McCallum,*
    584 F.3d 471 (2d Cir. 2009) ............................................................... 38

*United States v. Morgan,*
    786 F.3d 227 (2d Cir. 2015) ............................................................... 48

*United States v. Pena,*
    268 F.3d 215 (3d Cir. 2001) ............................................................... 63

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006) ................................................. 37, 38, 47

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) ............................................................... 41

*United States v. Scarfo,*
    41 F.4th 136 (3d Cir. 2022) ............................................................... 64

*United States v. Scott,*
    677 F.3d 72 (2d Cir. 2012) ................................................................ 37, 38

*United States v. Sewell,*
    252 F.3d 647 (2d Cir. 2001) ................................................................... 38

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) ................................................................... 40

*United States v. White Eagle,*
    721 F.3d 1108 (9th Cir. 2013) ............................................................... 63

*United States v. Williams,*
    585 F.3d 703 (2d Cir. 2009) ............................................................. 45, 50

*United States v. Zhong,*
    26 F.4th 536 (2d Cir. 2022) ...................................................... 49, 50, 52

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007) ................................................................. 64

## Statutes

18 U.S.C. § 371 ................................................................................. 5, 15

18 U.S.C. § 666(a) ........................................................................... 5, 15

18 U.S.C. § 1343 ......................................................................... 5, 15, 18

18 U.S.C. § 1346 ........................................................................... *passim*

18 U.S.C. § 1349 ......................................................................... 5, 15, 18

18 U.S.C. § 1951 ..................................................................... 4, 5, 15, 57

18 U.S.C. § 3231 ..................................................................................... 3

18 U.S.C. § 3553(a) ............................................................................... 31

18 U.S.C. § 3742 ..................................................................................... 3

28 U.S.C. § 1291 ..................................................................................... 3

vi

## INTRODUCTION

Eric Goldstein, who grew up in New York and attended the city's public schools, joined the New York City Department of Education (DOE) with the goal of improving the experience of students. As the head of the DOE's Office of School Support Services, he oversaw departments related to student transportation, athletics, and food services. He worked to enhance transportation options for students with special needs, like his own son. He expanded schools' athletics programs. And he brought in healthier food by seeking higher quality products.

In 2015, after working at the DOE for more than a decade, Goldstein was ready to move on. He and a friend, Hershel Meisels, had an idea for a business importing grass-fed beef. To get this business off the ground, Goldstein turned to Michael Turley, a professional he knew from prior work together in the food industry. Turley introduced him to Blaine Iler and Brian Twomey. They partnered to launch a new company, Range Meats Supply Company (RMSCO), to import beef.

While moving to start this new company, however, Goldstein was still working for the DOE. And Turley, Iler, and Twomey had separately formed another company, Somma Food Group (Somma), that had business before the DOE: Somma was trying to place its food products, including antibiotic-free chicken, in New York City schools.

Goldstein's ongoing relationship with Turley, Iler, and Twomey presented a conflict of interest. But it was not a federal crime. Goldstein did not engage in any illicit *quid pro quos* with the Somma partners, and he is innocent of the Hobbs Act extortion, honest services wire fraud, and federal bribery offenses for which he was federally prosecuted.

Goldstein was convicted because he did not receive a fair trial on these charges. The district court erroneously admitted extensive evidence related to conflicts of interest, confusing the jury as to the issues before it and unfairly prejudicing Goldstein. Because of the improper admission of this evidence, Goldstein should be granted a new trial.

Alternatively, Goldstein should be resentenced. At sentencing, the district court miscalculated his Sentencing Guidelines offense level by

2

erroneously treating all RMSCO's legitimate business expenses, including payments to third parties, as "bribes" to Goldstein. This error led to an improperly inflated Guidelines range, and thus warrants resentencing.

## STATEMENT OF JURISDICTION

This is an appeal from judgment entered on September 19, 2024, in the United States District Court for the Eastern District of New York (Chin, J., sitting by designation).[1] JA.1035. Goldstein's notice of appeal was filed on September 20, 2024. JA.1041. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## QUESTIONS PRESENTED

1)    Did the district court err by admitting extensive evidence related to conflicts of interest, where this evidence had limited to no probative value; confused the jury regarding the criminal actions and intent

---

[1] The defendants' joint appendix is cited as "JA." Entries on the district court docket, *United States v. Eric Goldstein et al.*, No. 21 Cr. 550 (DC), are cited "DE." Goldstein's Presentence Investigation Report is cited "PSR."

3

necessary to prove the charged offenses; and encouraged conviction on the improper basis of these other bad acts?

2) Should Goldstein's convictions for honest services wire fraud and Hobbs Act extortion under color of official right be reversed because the honest-services statute is unconstitutionally vague, and the Hobbs Act offenses cannot be proven by allegations of bribery?

3) Should Goldstein be resentenced where the district court overstated his Sentencing Guidelines range by erroneously considering all monetary transfers to a company, including for payments to third parties who provided legitimate services, to be "bribes" to the defendant?

## STATEMENT OF THE CASE

Eric Goldstein and his codefendants Michael Turley, Blaine Iler, and Brian Twomey were initially charged in an indictment filed on October 28, 2021. JA.84. On June 16, 2022, the government filed a Superseding Indictment with seven counts. JA.104. Goldstein was charged with (i) conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C.

4

§ 1951(a) (Count One); (ii) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Two); (iii) conspiracy to commit federal program bribery, in violation of 18 U.S.C. §§ 371 and 666(a) (Count Three); (iv) accepting a bribe, in violation of 18 U.S.C. § 666(a) (Count Five);[2] (v) conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349 (Count Six); and (vi) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Seven).

Goldstein, Iler, Turley, and Twomey were tried before a jury in May and June of 2023. They were convicted on all counts. JA.1007.

On September 9, 2024, the district court (Chin, J., sitting by designation) sentenced Goldstein to 24 months' imprisonment and two years of supervised release. DE 234; JA.1035. Goldstein and his codefendants remain released on bail pending appeal. JA.6407.

---

[2] Count Four charged Goldstein's codefendants with offering a bribe, in violation of the same statute.

## STATEMENT OF FACTS

### A. Eric Goldstein's Background and History of Public Service

Eric Goldstein, now 56 years old, was born and raised in New York City. PSR ¶¶ 129-31; JA.5284. He attended city public schools through high school and earned his college degree from Cornell University. JA.5284. After completing an advanced degree at Oxford and working for several years, Goldstein joined the DOE in 2003. JA.5285-90; PSR ¶ 135. He was motivated by a desire to help DOE students have a better experience in public school than he did. JA.5288. He started as a deputy in the DOE's Office of School Support Services. PSR ¶ 135. After five years, and a brief return to the private sector, he was promoted to Chief Executive of School Support. JA.5285-90. In this position, he oversaw thousands of employees and management of DOE departments, including the Office of Pupil Transportation, the Public School Athletic League, and the Office of Food and Nutrition Services (also known as SchoolFood). JA.5290-91.

During his tenure, Goldstein sought to provide the best experience for students, to improve children's health, and to make the DOE more environmentally friendly. As the father of an autistic child, he was driven to

improve transportation options for special needs students. JA.5292. This led him to bring in smaller transportation vehicles and to revamp the process by which the city awarded busing contracts. *Id.* He improved school athletic facilities, and expanded and diversified available programs, adding sports like cricket and Double Dutch to the curriculum. *Id.*

With respect to SchoolFood, Goldstein endeavored to find healthier and more sustainable food options for schools. He oversaw the introduction of salad bars in cafeterias, breakfast served in classrooms (to help increase student participation), and various efforts to reduce landfill waste. JA.5293. He implemented the DOE's general goal of putting more local food products on school menus. JA.5375. And starting around 2012, he pursued antibiotic-free chicken for schools, after learning from the Natural Resources Defense Council about the negative health effects of livestock antibiotics on children. JA.5294-96. By 2013, SchoolFood had begun outreaches to poultry suppliers seeking antibiotic-free chicken items for school menus. JA.5302-03.

Goldstein's efforts to improve school food extended beyond New York. He helped found the Urban School Food Alliance. JA.5293-94, 5296-97.

This Alliance brought together large school districts across the country, including in New York, Miami, Dallas, Los Angeles, and Chicago, to "share best practices on procurement and food policies," to make foods healthier and better for the children in those districts. JA.5293-94.

## B. Goldstein's Beef-Importing Business Venture with Turley, Iler, and Twomey (RMSCO)[3]

Goldstein valued his work at the DOE but, by 2014, he was looking to make a change. JA.5303. His marriage had "started to fall apart," and the ultimate divorce took a significant toll on him. *Id.* His autistic son had also begun to have more pronounced physical and social issues. *See* DE 207 at 12-14; JA.5311.

At the same time, a new administration had taken over DOE. Goldstein was a "hold-over" from the prior administration and it was made clear that he "was not one of their people." JA.5303. He began planning his

---

[3] Codefendant Brian Twomey's appellate brief includes a detailed recitation of the relevant facts and trial evidence. Goldstein incorporates these facts by reference and includes here only a more abbreviated recitation of facts relevant to specific issues he raises.

exit, asking friends to forward his resume to headhunters. JA.5303-04. Goldstein tried to be discrete about these efforts because he did not want others at DOE to know he was trying to leave. JA.5333.

One friend Goldstein reached out to was Hershel Meisels, an entrepreneur who operated a Jewish communal lending organization. JA.5305-06. The two discussed several business ideas, including in the food sector. JA.5307-09. One idea involved importing high-quality kosher or grass-fed beef from producers outside the United States. JA.5312-13. Meisels's uncle was an inspector of kosher beef processing and, as a result, "had connections to beef processors all over the world[,] especially in Poland." JA.5313.

While brainstorming with Meisels, Goldstein also contacted Michael Turley. JA.5308-09. The two had met when Turley worked for Tyson Foods, and Goldstein thought Turley was "smart," "accomplished," and knew "anything you wanted to know about animal protein." *Id.*

Turley, in turn, brought in Blaine Iler and Brian Twomey. JA.5309. The three were veterans of the food industry and, in 2015, they co-founded Somma Food Group (Somma). JA.4142.

Goldstein viewed the beef importing idea as an "exciting" prospect and "a real possibility" for a business. JA.5315. He discussed it with Turley, Iler, and Twomey, who seemed to agree it had potential. JA.5315-16. Goldstein, Meisels, Turley, Iler, and Twomey decided to form Range Meats Supply Company (RMSCO). JA.4699-4700. RMSCO was structured as a partnership in which Goldstein and Meisels each owned a 20% interest through LLCs, and Somma had a 60% interest. JA.2212. In June 2015, they retained the law firm Shutts & Bowen LLP to "form and incorporate [RMSCO] in the appropriate jurisdiction, to prepare agreements with two Polish companies" to secure "the exclusive right to be the Polish company's sole U.S. importer of its beef products, to prepare supply/distributorship agreements for [RMSCO] and to assist with other related matters." *See* JA.1961, 5335. RMSCO was formally registered in July 2015. JA.1124.

Over the next several months, Shutts & Bowen performed additional legal work for RMSCO, including researching international conventions related to safe food import, negotiating with attorneys for beef suppliers, and drafting distribution agreements. JA.1127-50. RMSCO also retained a Polish law firm, DeBenedetti Majewski Szcześniak, to assist with these matters. JA.5490-91.

Goldstein and his partners began traveling to visit prospective beef suppliers, including in Poland and Chile. JA.5337-38, 5343-44.

Despite these positive, concrete steps, Goldstein remained unsure that this new business venture would succeed. Because of this uncertainty, and his reluctance to tell people at DOE he hoped to leave, Goldstein did not discuss his partnership in RMSCO with others at the DOE. JA.5333-34. He continued to work his typical "10, 11 hour days" there, using vacation and other personal time to do work related to RMSCO. JA.5317.

The partners' efforts to launch RMSCO cost money, primarily legal fees and travel expenses. The individual partners paid some of these costs out of pocket and, under RMSCO's terms of incorporation, they were

11

entitled to reimbursements from RMSCO. Other costs were covered by funds sent from Somma to RMSCO. In October 2015, Somma transferred $20,000 to RMSCO. JA.5396-97. This allowed RMSCO to pay Shutts & Bowen $12,588.45, under half its bill to that point, and to reimburse Goldstein's travel costs. *See* JA.5394-97, 5503.

On May 13, 2016, Somma transferred an additional $10,000 to RMSCO. *See* JA.5491. This covered reimbursements for some of Goldstein's travel expenses and the DeBenedetti firm's legal fees. JA.5491-92. Even with those funds, RMSCO remained in debt.

Ultimately, RMSCO did not evolve into a viable business. Polish beef suppliers decided not to partner with RMSCO, and other food ideas floundered. *See* JA.5493, 5498. The company was never able to generate any income, and the principals decided to separate. JA.5494. They began discussing a separation agreement in August 2016. JA.5494, 5498. Over the next three months, they negotiated the terms of the separation. In the end, Somma agreed to transfer its ownership stake in RMSCO to Goldstein, along with $66,670.39 to cover RMSCO's outstanding debts. JA.2213-17. In

exchange, RMSCO agreed to indemnify Somma for any remaining liability and waive its noncompete protections as to any future Somma products; the parties also decided to abandon a possible licensing arrangement. JA.2213-17, 5499-5500, 5504. The separation was finalized in December 2016.

## C. Somma and SchoolFood

As detailed in codefendant Twomey's appellate brief, at the same time Goldstein, Meisels, Turley, Iler, and Twomey were working on RMSCO, Somma was trying to place its food products in New York City schools.

In brief, Somma marketed and supplied food products to various customers, including school districts. Starting in the spring of 2015, Somma sought to do business with DOE by submitting products to SchoolFood for consideration. This was an elaborate process. First, SchoolFood would send an "outreach" to multiple potential food suppliers with specifications for an item it wanted for school menus. JA.3447. SchoolFood would then review any proposals it received to make sure the item met nutritional and other specifications. *Id.* SchoolFood employees would request samples of the proposed item and conduct taste tests with both adult and student tasters.

JA.3447-48. If the item passed all these steps, its pricing information would go to a separate DOE department for approval. JA.3448-50. If the pricing was okayed, then the menu item was "approved." This meant food distributors that had contracts with the DOE could purchase the food to deliver to schools. In other words, even "approved" food brands did not have a contract with the DOE, nor were they guaranteed any actual sales to city schools. JA.3460, 3491. But SchoolFood's approval meant that the food could be purchased by distributors who supplied menu items to schools.

Between 2015 and 2017, Somma received SchoolFood's approval to supply three products for school menus: (i) a yogurt parfait; (ii) antibiotic-free chicken drumsticks; and (iii) antibiotic-free chicken tenders. JA.4322-23.

### D. The Criminal Allegations

In his role as Chief Executive of School Support, Goldstein oversaw SchoolFood throughout 2015 and 2016. He was thus involved in SchoolFood's decisions related to Somma while he was also launching RMSCO with Turley, Iler, and Twomey. He did not disclose his separate partnership in RMSCO to the DOE or his fellow SchoolFood employees. Nor

14

did he recuse or otherwise wall himself off from SchoolFood's decisions related to Somma. In his role at SchoolFood, he worked with the Somma partners and discussed Somma products with them—all at the same time he, Turley, Iler, and Twomey were pursuing RMSCO's business.

The government alleged that these actions constituted criminal bribery. The relevant superseding indictment charged the four men with conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count One); (ii) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Two); (iii) conspiracy to commit federal program bribery, in violation of 18 U.S.C. §§ 371 and 666(a) (Count Three); (iv) bribery, in violation of 18 U.S.C. § 666(a) (Counts Four and Five);[4] (v) conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349 (Count Six); and (vi) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Seven). JA.104.

---

[4] Count Four charged Goldstein's codefendants with offering a bribe, while Count Five charged Goldstein with accepting a bribe.

Underpinning all the charges was the allegation that the defendants engaged in illegal *quid pro quos*, whereby the Somma defendants bribed Goldstein to influence his official actions at the DOE.

## E. The Trial

The defendants were tried together before a jury in May and June 2023. At trial, the government acknowledged that RMSCO was not a "sham" business, and that Goldstein and his codefendants had done work, traveled, and spent money to try and launch this enterprise. But the government argued that Goldstein's relationship with the Somma partners was corrupt because they were working on RMSCO at the same time Somma was trying to provide menu items to the DOE. The government asserted that Somma's payments to RMSCO were illicit *quid pro quos* to influence Goldstein in his DOE work. The government's claims as to the specific *quid pro quos* evolved over time. Ultimately, the government argued that Somma transferred funds to RMSCO to influence Goldstein to help Somma get products on school menus sooner; to allow Somma to avoid a fine in January 2016 for not providing enough chicken drumsticks; and to lift a hold placed on the use of

16

Somma's chicken tenders in November 2016, after foreign matter was found in the tenders.

The government's trial evidence included testimony from SchoolFood employees who worked with Goldstein and were responsible for reviewing and approving Somma's products for school menus. The government also called individuals involved with Somma, including an employee and an investor. The government offered documentary evidence and testimony concerning the financials of RMSCO and Somma, as well as emails and messages among Goldstein, Turley, Iler, and Twomey related to Somma and RMSCO. There was also evidence of an FBI interview of Turley.

Throughout its case, the government elicited testimony to show that Goldstein and the Somma partners had endeavored to conceal their partnership in RMSCO from others at the DOE. The evidence also established the process and timeline by which Somma products were approved for use in New York City schools.

17

**F. The Conflict-of-Interest Evidence**

To bolster its assertion that Goldstein was guilty, the government presented evidence concerning Goldstein's conflict of interest as both a DOE employee and RMSCO partner. Pretrial, the government moved to admit evidence that Goldstein did not disclose his interest in RMSCO, or information regarding his relationship with Turley, Iler, and Twomey to the DOE or the New York City Conflicts of Interest Board. *See* DE 88 at 6. The government claimed this showed Goldstein's "corrupt intent to participate in the charged bribery scheme." *Id.*

Goldstein opposed admission of this evidence. DE 100. He argued that the evidence was inadmissible under Federal Rules of Evidence 404(b) and 403: these were "collateral matters" that were not relevant to any element of the charged offenses, and any minimal probative value of the evidence was outweighed by the risk of undue prejudice and confusion of the issues.

At the final pretrial conference, the government continued to push for admission of this evidence. According to the government, it was not introducing the evidence "to prove up that [Goldstein] violated his conflict

18

of interest, conflict of interest laws and, therefore, is guilty of a bribery scheme." JA.3123. Instead, the government said the evidence helped prove honest services wire fraud because it showed "Goldstein knowingly participated in a fraud, in a scheme to defraud DOE by means of false pretenses or representations. That is deception. And deceitful statements include half truths or concealments of facts." *Id.* The government also argued the evidence would show that it was not "totally fine that [Goldstein] had this business with these outside vendors," and rebut the defendants' contention that payments to Goldstein were "bona fide transactions" because "you don't conceal bona fide transactions." JA.3123-24.

In response, Goldstein objected that the government appeared to be arguing he could be liable for honest services fraud based on "undisclosed self-dealing," in contravention of *Skilling v. United States*, 561 U.S. 358 (2010). JA.3128. Counsel reiterated that admission of this evidence would lead to confusion of the issues and "distract[]" the jury with questions related to conflicts of interest and "civil regulations" not at issue in trial. JA.3128-29.

The district court admitted the evidence pursuant to Federal Rule of Evidence 404(b). JA.3131. The court found that the evidence was "probative of intent" and "relevant to the issues of deception and fraud and the probative value outweighs the danger of unfair prejudice."[5] JA.3131.

This conflict-of-interest evidence formed a central component of the government's case. In its case in chief, the government called Samantha Biletsky, an ethics officer and lawyer with DOE. JA.3729-30. Biletsky said that her job was to "give employees advice on conflict-of-interest rules," "liaison" with the New York City Conflicts of Interest Board, and review employee requests related to conflicts. JA.3730-31.

---

[5] The defendants reiterated their objection to this evidence during trial, raising further specific objections to testimony and an exhibit identified as a "plain language" guide to city conflict of interest rules, GX 45-A. *See* DE 113; JA.3676-89. These objections were overruled. JA.3683. Defendants then requested a limiting instruction with respect to this evidence, which the court gave. JA.3686-87, 3722-23, 3770-71. The limiting instruction stated that it was "not a federal crime for a city official to have a conflict of interest" or to violate the city's conflict-of-interest rules; that the evidence may only be used "in evaluating Mr. Goldstein's state of mind"; and that the evidence could not be considered against the other defendants. JA.3770-71.

Biletsky testified that DOE employees are responsible for knowing conflict-of-interest laws and that it would be a "conflict of interest" for a city employee to engage in any business that "conflicts with the proper discharge of his official duties." JA.3732-33. She discussed a "plain language" guide summarizing New York City conflict-of-interest rules, GX 45-A, declaring that employees may not "use" their position to "financially benefit themselves" or "anyone with whom they have a business or financial relationship"; that city employees "may not accept anything valued at $50 or more from anyone … doing business or seeking to do business with the city"; and that employees may not "have a job with anyone … who does business with the city." JA.3733-38; JA.2218 (GX 45-1); *see also* JA.3757-58 (Biletsky testifying that city employees could not "accept a tip or gratuity" for doing their job, and that employees could not accept a gift of $50 or more from any organization intending to do business with the city).

Biletsky elaborated that these conflict-of-interest rules were intended to "uphold integrity" in city government, so that the "public can know that when people working for the Government are making decisions they're

doing it in the best interest of the city and they're not taking into account their own personal financial benefit." JA.3731-32. Throughout her testimony, she reiterated that these conflict-of-interest rules were intended "to uphold integrity in government to make sure that public servants are doing what's in the best interest of the city and the DOE, and not engaging in something that's for their own personal interest." JA.3746.

With respect to this case, she testified that she was "virtually certain" Goldstein had never told her about his involvement with RMSCO. JA.3758. In fact, a government exhibit subsequently offered by the defense showed that Goldstein had disclosed that he was a partner in RMSCO to the New York City Conflicts of Interest Board in 2016. *See* JA.2156, 5622-23.

The government continued to highlight conflict-of-interest issues throughout trial. Over objection, the government elicited from a different witness, Goldstein's accountant Joseph Romano, that Romano had discussed "conflicts of interest with Mr. Goldstein" and told him to "be careful not to be moonlighting, not to have any issues." JA.3716. And during cross-examination of Goldstein, who testified in his own defense, the government

spent approximately 30 minutes asking him about conflicts of interest. *See* JA.5529, 5532, 5534-35, 5538-43, 5628-30; *see also* JA.5576 (noting length of cross-examination on topic). This included asking about Goldstein's failure to make disclosures to Biletsky and suggesting that he had violated the plain-language guidelines related to conflicts, GX 45-A. *See* JA.5535-42.

In closing, the government suggested that the conflict-of-interest rules were coextensive with the requirements of federal criminal law. Echoing Biletsky's testimony about conflicts of interest, the prosecution broadly argued that the charged federal criminal laws were intended to ensure that public employees, like Goldstein, acted with "integrity": "The bribery laws that the government has charged here are not about whether public officials made good or bad decisions. They're about the process of making the decision. Public officials are supposed to be independent …. It's so that we can all go to sleep at night without worrying whether our public officials are acting honestly and with integrity." JA.5867; *see also* JA.6131 (arguing "this case is about" "ensuring that our public officials act with integrity").

23

The government's closing presentation included an excerpt of the plain language conflicts guide, GX 45-A, with portions highlighted by the government for emphasis:





**New York Conflicts of Interest Law, Covering New York City Public Servants**
(*Plain Language Version**)

1. *Misuse of Office.* Public servants may not use or misuse the position to financially benefit themselves, their family members, or anyone with whom they have a business or financial relationship.

2. *Misuse of City Resources.* Public servants may not use City letterhead, personnel, equipment, supplies, or resources for a non-City purpose, nor may they pursue personal or private activities during times when they are required to work for the City.

3. *Gifts.* Public servants may not accept anything valued at $50 or more from anyone that they know or should know is doing business or seeking to do business with the City.

4. *Gratuities.* Public servants may not accept anything from anyone other than the City for performing their official duties.

5. *Seeking Other Jobs.* Public servants may not seek or obtain a non-City job with anyone whom they are dealing with in their City job.

6. *Moonlighting.* Public servants may not have a job with anyone that they know or should know does business with the City or that receives a license, permit, grant, or benefit from the City.

JA.630; DE 163 at 73.

The government characterized these as the "rules that cover city public servants like Mr. Goldstein," and asserted that Goldstein's violation of these rules proved he was engaged in criminal activity—or at least that his

24

knowing violation of the rules was tantamount to criminal intent. The government argued to the jury: "Don't misuse your position to make money for yourself or for your business partners. Don't even use it for that purpose. Well, Eric Goldstein was doing that. He was using his position to make money through Range Meats. And he was using his position to help SOMMA make money, SOMMA his business partner in Range Meats. Next: Don't accept anything valued at $50 or more from anyone doing business with the city. Well, he certainly accepted some many things valued more than $50. Don't try to get a job with anyone you deal with in your city job. Goldstein and Twomey both told you that Goldstein was doing exactly that. Of course, Goldstein knew what he was doing was wrong. They all knew it." JA.5800; *see also* JA.6113 ("Misuse of office. The very first one: Public servants may not use or misuse the position to financially benefit themselves, their family members, or anyone with whom they have a business or financial relationship. He, Eric Goldstein, had a business relationship and financial relationship with SOMMA.").

The government argued that Goldstein's conflict-of-interest violations established criminal intent because, according to the government, these violations were "wrong" and Goldstein and his codefendants knew it: "It wouldn't just be wrong for Eric, it would be wrong for them [the other defendants] too. … Because none of them should be in business with each other, and they all know it. Joseph Romano, Eric's accountant … he warned Eric Goldstein about it. … Samantha Biletsky the DOE's ethics officer … she confirmed it. Eric Goldstein was absolutely not allowed to be in business with a company that had business before the DOE." JA.5799-5800.

Further, according to the government, if Goldstein were "acting in good faith," and not with criminal intent, "he would have recused himself" from decisions involving Somma. JA.6113-14. But because he did not, his actions were criminal. As the government stated in closing: "This right here, this is what corruption looks like, by sophisticated players. … It's the creation of a corrupt side business." JA.5875.

### G. The Defense Case

Twomey and Goldstein both testified in their own defense. *See* JA.4662, 5282. Goldstein explained his history with the DOE, why he started looking for new opportunities in 2014, and how RMSCO came about. He also explained his role at SchoolFood and his interactions with Somma and its partners. He denied any unlawful conduct or engaging in a bribery scheme. He explained that his "DOE responsibilities came first." JA.5317.

The defense also called a lawyer from Shutts & Bowen who had performed legal work for RMSCO, JA.5246, and offered documents showing the legitimate work undertaken to try to launch RMSCO.

### H. The Verdict and Defendants' Motions for Acquittal and a New Trial

On June 28, 2023, the jury returned a verdict of guilty as to all defendants on all counts. JA.1007. The defendants had moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the government's case and at the close of all the evidence. After trial, they reiterated their motions for acquittal under Rule 29 and moved for a new trial under Federal Rule of Criminal Procedure 33. *See* DE 166.

In their initial Rule 29 motion, the defendants generally asserted that "[t]he evidence is insufficient on every element of every count," JA4657, and added more specific arguments regarding the evidence's insufficiency.

During argument on these motions, the district court expressed skepticism as to the sufficiency of the proof: while opining that there was "no question that Mr. Goldstein . . . should not have been in business with the Somma principals in the circumstances here," the court queried "whether a reasonable jury could find that Messrs. Iler, Turley and Twomey gave something of value to Mr. Goldstein" "in exchange for the performance of official acts with corrupt intent." JA.4722-25.

However, following post-trial briefing, the district court declined to grant a judgment of acquittal or new trial. JA.950. The court found sufficient evidence of "an overarching bribery scheme whereby Iler, Turley, and Twomey entered into a potentially valuable joint venture with Goldstein," where they agreed "to provide financial and other support to this new venture" and Goldstein agreed "to exercise his official authority at SchoolFood for SOMMA's benefit." JA.976.

28

The defendants had alternatively sought a new trial based on the district court's admission of the conflict-of-interest evidence and inflammatory testimony related to school food safety issues. JA.992-93. The court also denied this motion. The court reiterated its finding that the conflict-of-interest evidence was admissible, opining it was relevant "that Goldstein was blatantly violating the New York City conflict of interest rules" because this was "strong evidence of a corrupt intent." JA.994. The court further found Goldstein's failure to disclose this conflict to be "strong evidence of consciousness of guilt." JA.995.

## I. Goldstein's Sentencing

Goldstein and his codefendants were sentenced on September 9, 2024. JA.6318. In advance of sentencing, the Probation Department prepared a presentence report (PSR) with each defendant's Sentencing Guidelines calculation. Goldstein's convictions were grouped, and his offense level was calculated under U.S.S.G. § 2C1.1. Section 2C1.1(a) provides a base offense level of 14 for public officials. PSR ¶ 92. The Probation Department then applied additional enhancements.

As relevant here, Probation asserted that all funds ever transferred from Somma to RMSCO constituted the "value" of bribes received by Goldstein for purposes of § 2C1.1(b)(2). These amounts included (i) the $20,000 transfer from Somma to RMSCO in October 2015; (ii) the $10,000 transfer in May 2016; and (iii) the $66,670.39 payment in November 2016, when Somma separated from RMSCO—for a total of $96,670.39. Since this totaled over $95,000, Probation applied an eight-level enhancement. *See* PSR ¶ 94 (citing U.S.S.G. §§ 2B1.1(b)(1) and 2C1.1(b)(2)).

The defendants objected to this value calculation. *See* DE 201. They argued the October 2015 and May 2016 payments should not be included because the government had not proven—and, with respect to the May 2016 payment, had abandoned any argument—that these payments were bribes. DE 201 at 7, 13-15. Further, all these payments went to RMSCO, not Goldstein, and the government had not proven that any portion of the payments, which indisputably went to cover RMSCO's legitimate business expenses, were corrupt. *See* DE 201 at 1-2, 6-8.

30

At sentencing, the district court overruled these objections and applied this eight-level enhancement. JA.6329. According to the court, "[e]ven though the payments were made through RMSCO, they had value to Mr. Goldstein. And even though some of the monies went to legitimate expenses in terms of airplane tickets, et cetera, this was still a value to Mr. Goldstein because it was for the benefit of this new business." JA.6329-30.

With this eight-level enhancement, the court calculated Goldstein's total offense level as 26. Goldstein had no criminal history. With an offense level of 26 and a criminal history category of I, his Guidelines range was 63 to 78 months. JA.6339.

As to the additional 18 U.S.C. § 3553(a) sentencing factors, Goldstein's counsel emphasized Goldstein's history of public service, his good character, his family situation (including the needs of his son and his ex-wife's health issues), the various collateral consequences he had already suffered from the prosecution, and his remorse. JA.6343-54. In his own letter to the court and at the hearing, Goldstein expressed remorse for his actions. JA.6354.

31

Considering the Guidelines and the other relevant sentencing factors, the court sentenced Goldstein to 24 months in prison, followed by two years of supervised release. JA.6392.

In explaining its sentence, the court opined that all the defendants were "fundamentally good men" and "hard-working individuals" who "have led good lives." JA.6390. "All four Defendants have engaged in civic and charitable activities. They've made a positive impact. … [They] present little risk of recidivism and all four have been punished already to a great degree. And I do believe all four are remorseful." JA.6390-91. But, the court added, "they did go astray and seriously astray." JA.6390. The court characterized their actions as "serious, brazen crime[s]" involving "a substantial breach of the public trust in an important area." JA.6391.

At the close of the sentencing, the court granted all defendants bail pending appeal "in light of all the circumstances," including that the court itself had "at one point" expressed "some skepticism about the case," though it ultimately found the evidence sufficient. JA.6397-98.

## SUMMARY OF ARGUMENT

The government's trial evidence showed, at most, that Goldstein engaged in undisclosed self-dealing or labored under a conflict of interest in his dealings with Somma: while Goldstein was working for the DOE, he was trying to start a separate business with Turley, Iler, and Twomey. Under local conflict-of-interest rules, Goldstein should not have done this. But that does not mean that Goldstein committed any federal crime. The Supreme Court has narrowly interpreted federal corruption laws that reach local officials, to respect state sovereignty and ensure that local governments maintain primary authority to regulate the "permissible scope of interactions between state officials and their constituents." *Snyder v. United States*, 604 U.S. 1, 14 (2024).

"The upshot is that federal fraud law leaves much public corruption to the States (or their electorates) to rectify." *Kelly v. United States*, 590 U.S. 391, 399 (2020). Thus, even when there is evidence of "deception, corruption, [or] abuse of power," federal statutes "do not criminalize all such conduct." *Id.* at 394. In particular, federal criminal statutes do not reach undisclosed self-

dealing or conflicts of interest, including where an employee acts to advance his "own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Skilling v. United States*, 561 U.S. 358, 409 (2010).

But at Goldstein's trial, the government repeatedly obscured the distinction between federal corruption laws and local conflict-of-interest rules, equating Goldstein's ethical lapses with criminal behavior. The government was able to advance these arguments because the trial court improperly admitted extensive evidence related to conflicts of interest. This evidence should have been excluded and its improper admission denied Goldstein a fair trial. The Court should order a new trial.

In addition, Goldstein's convictions for Hobbs Act extortion and honest services wire fraud should be reversed. Goldstein is not guilty of extortion under "color of official right" because the government asserted only a bribery scheme. There was no evidence that Goldstein obtained property under the pretense that he was entitled to it by virtue of his office, as should be required to establish Hobbs Act extortion under color of official

34

right. Further, Goldstein is not guilty of honest services fraud in violation of 18 U.S.C. § 1346, because the statute is unconstitutionally vague.[6]

At a minimum, Goldstein should be resentenced. At sentencing, the district court overstated Goldstein's Guidelines offense level and range by erroneously treating all of Somma's payments to RMSCO, including those that went to third parties to pay legitimate business expenses, as "bribes" to Goldstein. This significant procedural error warrants resentencing.

## ARGUMENT

### I. The district court erred by admitting extensive evidence related to conflicts of interest.

Federal criminal law is not coextensive with local conflict-of-interest regulations. Violating a fiduciary duty, or acting while under a conflict of interest, is not a federal crime. Goldstein and his codefendants were charged with specific federal offenses related to bribery. But the legal requirements of these offenses were obscured and confused by the district court's

---

[6] As discussed in Sections III and IV, Goldstein recognizes that these arguments are foreclosed by precedent but raises them for purposes of preservation and further review.

admission of irrelevant and unfairly prejudicial evidence related to Goldstein's conflicts of interest as a DOE employee. The government took full advantage of this confusion in its arguments to the jury by conflating a violation of conflict-of-interest rules with criminal activity and intent. Because the government cannot show that the improper admission of this evidence was harmless, a new trial is necessary.

**A.**    **The Constitution and Rules of Evidence prohibit the admission of irrelevant and unduly prejudicial, confusing, and misleading evidence.**

Both the Constitution and the Federal Rules of Evidence preclude the admission of irrelevant and unduly prejudicial, confusing, or misleading evidence. The Due Process Clause protects against the admission of unduly prejudicial evidence if it renders a trial fundamentally unfair. *See, e.g.*, *Andrew v. White*, No. 23-6573, 604 U.S. ---, 2025 WL 247502, at *3 (2025).

Similarly, only "relevant" evidence is admissible under Federal Rule of Evidence 401, and Rule 403 calls for the exclusion of even relevant evidence where the evidence's "probative value is substantially outweighed

by a danger of … unfair prejudice, confusing the issues, misleading the jury, … or needlessly presenting cumulative evidence."

Federal Rule of Evidence 404(b) further states that "evidence of any other crime, wrong, or act is not admissible to prove a person's character," though it "may be admissible for another purpose, such as proving … intent … knowledge, [or] identity." To determine if evidence is admissible under this rule, a court must consider (i) if the evidence is offered for a proper purpose; (ii) if it is relevant to a material issue in dispute; (iii) if the probative value of the evidence substantially outweighs its undue prejudicial effect; and (iv) if there is a proper limiting instruction. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012) (citing *Huddleston v. United States*, 485 U.S. 681 (1988)).

Evidence is "unfairly" prejudicial if it "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (quoting *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980)); *see also Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term

37

'unfair prejudice,' … speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). "The prejudice must be unfair in the sense that it could unduly inflame the passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial." *Quattrone*, 441 F.3d at 186.

This Court has adopted an "inclusionary" approach to the admission of other-act evidence but has cautioned that this is not "carte blanche" to admit such evidence. *Scott*, 677 F.3d at 79; *see also United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009). On appeal, this Court reviews the admission of evidence for abuse of discretion, and any related legal issues *de novo*. *See Scott*, 677 F.3d at 79; *United States v. Sewell*, 252 F.3d 647, 650 (2d Cir. 2001).

## B.    The conflict-of-interest evidence should have been excluded.

Goldstein's trial was supposed to be about whether he and his codefendants were guilty beyond a reasonable doubt of specific bribery-related federal crimes. Instead, it became a referendum on ethical violations and alleged failures to comply with local conflict-of-interest rules. The

38

freewheeling admission of extensive conflict-of-interest evidence against Goldstein—exploited by the government throughout the trial—violated his due process rights and the Federal Rules of Evidence, improperly prejudicing him and denying him a fair trial.

### 1. This evidence had limited, if any, probative value.

First, the conflict-of-interest evidence had limited to no probative value. The government's justification for offering this evidence was that Goldstein was required to disclose his business relationship with his codefendants to the city and, therefore, his failure to disclose this relationship constituted fraud. The government also argued that Goldstein's failure to disclose his business relationship with his codefendants evinced criminal intent or consciousness of guilt.

This appears to be the rationale under which the court admitted the evidence. The court stated that the evidence went to Goldstein's "intent" and "issues of deception and fraud," JA.3131, and told the jury that it could consider the evidence as to Goldstein's "state of mind," JA.3770-71. Further, in denying the defendants' motions under Rules 29 and 33, the district court

opined that Goldstein's failure to disclose his partnership in RMSCO was "strong evidence" of "consciousness of guilt." JA.994-95.

In fact, there was no proper basis to admit this conflict-of-interest evidence. Contra the government's first argument, the evidence did not show the relevant criminal intent. Goldstein and his codefendants were charged with bribery offenses. All the alleged crimes required proof of a bribery scheme, and the specific intent to engage in a *quid pro quo*; that is, an intent to be influenced in some official action in exchange for payment. *See, e.g.*, *Snyder*, 603 U.S. at 5; *Skilling*, 561 U.S. at 409; *McDonnell v. United States*, 579 U.S. 550, 573-74 (2016); *United States v. Silver*, 948 F.3d 538, 548 (2d Cir. 2020). The offenses did not require some more generalized intent to violate conflict-of-interest rules or betray a fiduciary duty.

Moreover, with respect to the honest services wire fraud charges, this government argument collapses the careful distinction the Supreme Court has drawn in cases including *Percoco v. United States*, 598 U.S. 319, 328 (2023), and *Skilling*, 561 U.S. at 409, between bribery schemes versus other forms of undisclosed self-dealing. Supreme Court precedent is clear that § 1346

40

criminalizes only bribery: *a quid pro quo* whereby the defendant is influenced in his official actions in exchange for payment. Section 1346 does not reach other violations of an official's fiduciary duties, including failures to disclose conflicts of interest or other forms of "self-dealing," *see Skilling*, 561 U.S. at 409-10—for example, where a defendant "causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer," *see United States v. Rybicki*, 354 F.3d 124, 140 (2d Cir. 2003) (en banc) (discussing pre-*Skilling* categories of honest services fraud cases, distinguishing "bribery or kickback" cases from "self-dealing cases"). The Supreme Court has drawn and carefully policed this line between bribery and other forms of self-dealing to save § 1346 from unconstitutional vagueness. But the admission of extensive conflict-of-interest evidence at Goldstein's trial, and the government's arguments about this evidence, obscured the line—improperly encouraging the jury to find him guilty of federal crimes because he violated a fiduciary duty or had a conflict of interest.

Next, to the extent that this conflict-of-interest evidence was offered to establish "consciousness of guilt," under the theory that Goldstein and his codefendants were concealing their partnership, *see* JA.995, it was merely cumulative of other evidence the government offered to show such concealment. Throughout trial, the government elicited evidence that Goldstein and his codefendants took steps to conceal their business partnership. *See, e.g.*, JA.5798-99 (government closing summarizing such evidence); JA.981-92 (district court opinion collecting such evidence). Twomey's brief explains why such concealment evidence is insufficient to convict the defendants, and Goldstein testified as to the non-criminal reasons for this concealment. But insofar as this concealment was relevant to "consciousness of guilt," the concealment was well-established by other evidence and did not need to be proven by the conflict-of-interest evidence.

The conflict-of-interest evidence also went well beyond what might be proper to show that Goldstein concealed a business relationship he was supposed to disclose. The government made extensive use of the "plain language" conflict of interest rules. The government admitted this exhibit,

42

walked its own witness through the rules, GX 45-A, asked Goldstein about the rules on cross-examination, and referenced the rules in both its initial and rebuttal summations. In doing so, the government emphasized rules prohibiting public employees from "financially benefit[ing] themselves"; "accept[ing] anything valued at $50 or more"; and working on particular matters even after they left city employment.

But, again, federal law is more circumscribed than conflict-of-interest prohibitions: things like misusing one's position for financial gain or accepting gratuities are not federal crimes. As a result, there was no legitimate reason for the government to put these rules before the jury, much less to make them a centerpiece of its case. This evidence could only serve to confuse the jury regarding the legal requirements of the charged crimes and encourage the jury to convict Goldstein simply because he acted unethically.

## 2. The conflict-of-interest evidence created a significant risk of juror confusion and undue prejudice.

The government made the most of this evidence's potential for unfair prejudice. The government presented city conflict-of-interest regulations as "rules" Goldstein was supposed to follow and argued that his failure to

abide by these rules was "wrong," and evinced blameworthy conduct and intent. The government repeatedly referenced these rules and urged the jury to find that breaking them was proof of the charged crimes: "Don't misuse your position to make money for yourself or for your business partners. Don't even use it for that purpose. Well, Eric Goldstein was doing that. He was using his position to make money through Range Meats. And he was using his position to help SOMMA make money, SOMMA his business partner in Range Meats. Next: Don't accept anything valued at $50 or more from anyone doing business with the city. Well, he certainly accepted some many things valued more than $50. Don't try to get a job with anyone you deal with in your city job. Goldstein and Twomey both told you that Goldstein was doing exactly that. Of course, Goldstein knew what he was doing was wrong. They all knew it." JA.5800. In closing, the government literally highlighted Goldstein's violation of these rules as proof of his guilt. *See* JA.630 (government closing presentation).

44

In these circumstances, a lay jury would be likely to improperly equate Goldstein's violation of these rules with the charged crimes and to equate an intent to violate these rules with the necessary criminal intent.

This is not a problem that could be solved by the court's general limiting instruction that it is "not a federal crime to have a conflict of interest," and that the evidence could only be used "in evaluating Mr. Goldstein's state of mind," JA.3770-71. Even with this instruction, a rational juror would be confused as to how to use the conflict-of-interest evidence without equating it with the charged crimes, particularly given the government's repeated suggestion that they were one and the same. *See, e.g.,* *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("A limiting instruction 'does not invariably eliminate the risk of prejudice notwithstanding the instruction.'") (citation omitted); *United States v. Williams*, 585 F.3d 703, 709 (2d Cir. 2009) (stating presumption that jury follows limiting instruction "is dropped where there is an overwhelming probability that the jury will be unable to follow the court's instructions" and the instruction is "general and vague"); *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (same).

45

Moreover, even if the jury grasped the fine but critical distinctions between local conflict-of-interest rules and federal criminal laws—distinctions that continue to elude federal courts—the admission of this conflict evidence created the risk that the jury would simply conclude Goldstein was a dishonest or "bad" actor and convict him on that basis.

Other bad-act evidence carries the danger that a jury will convict a defendant "because of the jury's willingness to assume his present guilt from his prior misdeed," or based on the jury's desire to punish the defendant for these other bad acts, which "may not have been punished." *United States v. Aboumoussallem*, 726 F.2d 906, 911 (2d Cir. 1984). A jury may readily "generaliz[e]" other "bad act[s] into bad character," and take that bad character as "raising the odds" that the defendant committed the charged crimes; or worse, as calling for the defendant's conviction even if he "should happen to be innocent" of the charged offenses. *Old Chief*, 519 U.S. 180-81.

Given the government's repeated emphasis on the wrongful nature of Goldstein's conflict of interest, and the importance of ensuring the "integrity" of public officials, there was a significant risk that the jury would

46

convict Goldstein based on these improper conflicts, even without sufficient proof he violated black-letter criminal law.

This Court recognized a similar risk in *United States v. Quattrone*, 441 F.3d 153, 161 (2d Cir. 2006). In *Quattrone*, the defendant was charged with corruptly endeavoring to obstruct a grand jury proceeding and SEC investigation, and witness tampering. At trial, the government offered evidence pursuant to Rule 404(b) suggesting that Quattrone had failed to make certain required disclosures in another matter, in violation of SEC regulations. *Id.* at 185-87. This Court deemed the admission of this evidence erroneous and improperly prejudicial: although the evidence had "significant probative value," it also "gave rise to the potential for unfair prejudice" to the defendant because it confused the jury regarding the actual charges before it and tempted the jury to convict the defendant on the improper basis of this separate obstructive conduct.

So too here: the conflict-of-interest evidence gave rise to unfair prejudice to Goldstein because it confused the issues before the jury (*quid pro quos* versus a violation of ethical rules) and encouraged the jury to convict

Goldstein on the improper basis that he was a dishonest public servant, who failed to follow the rules and act with integrity—regardless of whether he actually committed the charged crimes.

### 3. Admission of this evidence was an abuse of discretion.

The district court's terse decision admitting this evidence did not meaningfully engage with the risk of undue prejudice weighed against the evidence's limited probative value. "Where 'there was inadequate consideration of the probative value of the evidence,' or a failure to adequately 'consider the risk of unfair prejudice and to balance this risk against probative value,' [this Court] will reverse an evidentiary determination as an abuse of discretion." *United States v. Morgan*, 786 F.3d 227, 232 (2d Cir. 2015) (quoting *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980)) (finding abuse of discretion and vacating conviction based on improper admission of threat, where threat was probative of consciousness of guilt, but court did not adequately consider risk of prejudice). Similarly, "[t]he district court abuses its discretion when it admits 'other act' evidence

48

with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue." *Curley*, 639 F.3d at 57.

The district court abused its discretion here. The admitted conflict-of-interest evidence had virtually no probative value. It was not relevant to any element of the charged offenses. And to the extent it showed Goldstein's concealment of his relationship with his codefendants, and therefore evinced some general consciousness of wrongdoing, it was more extensive than what would be relevant to that point and merely cumulative of other evidence showing such concealment. Finally, the evidence carried "a high possibility of jury misuse," *Curley*, 639 F.3d at 57, and unfair prejudice. The evidence should have been excluded.

## C.   The admission of this unduly prejudicial and confusing evidence requires a new trial.

The government cannot sustain its burden of showing that the erroneous admission of this conflict-of-interest evidence was harmless. An evidentiary error is only harmless if the Court can say "with fair assurance" that the jury's judgment "was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see United States v. Zhong*,

49

26 F.4th 536, 558 (2d Cir. 2022). To gauge harmlessness, this Court considers the overall strength of the government's case; whether the evidence bore on a critical issue; and the prosecutor's conduct with respect to the evidence. *See, e.g.*, *Zhong*, 26 F.4th at 558; *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008). All these factors support a finding of prejudice.

This was a close case where the government's evidence of criminality was weak. For the reasons detailed in the defendants' Rule 29 motions and codefendant Twomey's appellate brief, the defendants maintain that the government's trial evidence was in fact insufficient. But even if this Court deems the evidence legally sufficient, it was far from "overwhelming." *See, e.g.*, *Williams*, 585 F.3d at 709 (holding admission of other act evidence prejudicial where trial evidence was not overwhelming). In fact, while the district court ultimately denied the defendants' Rule 29 motion, it expressed doubts about the sufficiency of the government's case throughout trial.

Next, the jury likely used the improperly admitted conflict-of-interest evidence to resolve the critical issues at trial. There was little dispute about the bare facts of the case. Everyone agreed that Goldstein embarked on a

business venture with Turley, Iler, and Twomey while working for the DOE. The government conceded that this venture, RMSCO, was not a "sham." There was also no dispute that RMSCO incurred legitimate expenses, including legal fees, which Iler, Turley, and Twomey paid. Goldstein's actions at SchoolFood related to Somma products were also largely undisputed.

The disputed issue was *why* Goldstein, Iler, Turley, and Twomey did what they did. Was Goldstein engaging in illicit *quid pro quos*, accepting bribes from his codefendants with the intent to be influenced by them in his official actions towards Somma? Or was Goldstein doing his job at SchoolFood without such criminal intent, but while also pursuing an outside business venture with the Somma partners? The former would be criminal; the latter would not.

But the government's conflict-of-interest evidence, and the arguments that it made about that evidence, effectively collapsed this distinction. The admission and discussion of this conflict-of-interest evidence suggested that if Goldstein had acted under a conflict of interest or violated his fiduciary

duties, then he also acted criminally. In this way, the evidence encouraged the jury to do what federal law prohibits—to find Goldstein guilty of federal bribery, Hobbs Act, and wire fraud charges based on violations of local conflicts-of-interest rules.

The district court itself appears to have fallen into this trap of conflating conflicts of interest with federal criminal violations. In denying the defendants' Rule 29 motion and opining that there was sufficient evidence of bribery, the court noted that correspondence between Goldstein and his codefendants did not read like communications "in an arms'-length commercial relationship," JA.983. But that is not the standard for determining whether conduct rises to the level of criminality.

Finally, the government's repeated reference to this evidence underscores its significance. *See, e.g., Zhong*, 26 F.4th at 558-59 (declining to find improper admission of other act evidence harmless where government referenced it "multiple times" in jury statements); *Curley*, 639 F.3d at 62-63 (finding other act evidence significant and prejudicial where "the government highlighted the evidence during summations"). In addition to

devoting substantial portions of its case in chief and cross-examination of Goldstein to conflicts of interest, the government made extensive use of the evidence in closing. Given these facts, the government cannot establish that the erroneous admission of this evidence was harmless.

In sum, the district court erred by admitting this prejudicial conflict-of-interest evidence, and this error deprived Goldstein of a fair trial. As a result, his convictions should be vacated.

## II. The defendants were entitled to acquittal on all counts because of the legal insufficiency of the evidence, and the district court erred by admitting inflammatory food-safety evidence.

Pursuant to Federal Rule of Appellate Procedure 28(i), Goldstein joins the arguments made by his codefendants Brian Twomey and Michael Turley. For the reasons stated in Twomey's and Turley's appellate briefs, the government's trial evidence was legally insufficient to establish the charged offenses, and Goldstein was entitled to a judgment of acquittal on all counts.

In addition, for the reasons argued in Twomey's brief, Goldstein should be granted a new trial based on the district court's improper admission of inflammatory evidence related to school food safety issues.

53

### III.  The honest services fraud statute is unconstitutionally vague.

Goldstein's convictions on Counts Six and Seven should also be vacated because honest services fraud, as defined in 18 U.S.C. § 1346, is unconstitutionally vague, both on its face and as applied to Goldstein. Counsel recognizes that the Supreme Court and this Court have thus far declined to hold § 1346 void for vagueness, *see, e.g.*, *Skilling*, 561 U.S. at 403, but raises this issue for purposes of preservation and further review.

The Fifth Amendment's Due Process Clause prohibits the government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352 (1983)). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385 (1926)).

The Supreme Court has made frequent attempts to define and limit "honest services" fraud—*e.g.*, *Percoco*, 598 U.S. at 322; *Skilling*, 561 U.S. at 403; *McNally v. United States*, 483 U.S. 350, 360 (1987)—but this crime has proved hopelessly indeterminate. Uncertainty persists regarding "when the duty of honest services arises, what sources of law create that duty, or what amounts to a breach of it." *Percoco*, 598 U.S. at 334 (Gorsuch, J., concurring). By leaving those questions unanswered, § 1346 "provides no 'ascertainable standard' for the conduct it condemns." *Skilling*, 561 U.S. at 424 (Scalia, J., concurring) (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921)). The result is that citizens lack "'fair notice of the conduct [§ 1346] punishes.'" *Percoco*, 598 U.S. at 336 (Gorsuch, J., concurring) (quoting *Johnson*, 576 U.S. at 595).

In *Skilling*, the Supreme Court sought to identify the core prohibition of § 1346, and avoid holding the statute unconstitutionally vague, by limiting it to "bribery and kickback schemes" where a defendant accepted a bribe or kickback "in exchange for dishonest conduct." 561 U.S. at 326; *accord Percoco*, 598 U.S. at 368. In doing so, the Court opined that § 1346 does not reach "undisclosed self-dealing by a public official," "*i.e.*, the taking of

official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Skilling*, 561 U.S. at 409.

This case demonstrates how easily § 1346's supposed core criminal conduct of accepting a bribe or kickback melds with undisclosed self-dealing; how, in real world applications of this law, it is impossible to draw consistent lines between what is a federal crime and what is not.

The government's theory was that Goldstein used his official position with the DOE to financially benefit his partners in a side business, RMSCO, in turn benefitting himself. And, according to the government, Goldstein's "dishonest conduct" was failing to disclose this interest or otherwise breaching some fiduciary duty he owed to the DOE. On these facts, how can a reasonable person reliably distinguish bribery from undisclosed self-dealing? If a public official acts for the financial benefit of his secret business partners, in turn benefitting himself, is this criminal honest services fraud or merely non-criminal undisclosed self-dealing? The difficulty of consistently

distinguishing the two underscores the continuing uncertainty and vagueness in honest services fraud cases.

Even after federal courts have spent decades trying to ascertain and cabin the breadth of "honest services" fraud, "[n]o consensus has emerged." *Sorich v. United States*, 555 U.S. 1204 (2009) (Scalia, J., dissenting from denial of certiorari). The expansive phrase continues to "invite[] abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct." *Id.* Section 1346 should be held unconstitutional.

## IV. The Court should find the evidence insufficient as to Hobbs Act extortion because the government asserted only a bribery scheme.

The Court should also vacate Goldstein's convictions related to Hobbs Act extortion, Counts One and Two. Even if this Court rejects the defendants' other sufficiency and legal arguments, the government asserted only a bribery scheme. The evidence did not show that Goldstein committed Hobbs Act extortion or conspired to do so.

The Hobbs Act, 18 U.S.C. §§ 1951(a) and (b)(2), prohibits the obstruction of commerce "by robbery or extortion," with "extortion" defined

as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Goldstein and his codefendants were charged with substantive and conspiracy Hobbs Act extortion offenses "under color of official right."

In *Evans v. United States*, 504 U.S. 255, 257 (1992), the Supreme Court held that Hobbs Act extortion "under color of official right" requires nothing more than "acceptance of [a] bribe." Such extortion was not "*limited* to wrongful taking under a false pretense of official right." *Id.* at 269.

*Evans* has spawned criticism since the day it was decided. In *Evans* itself, Justice O'Connor opined that the Court should not have reached this issue given the limited question presented. *See id.* at 272 (O'Connor, J., concurring). And Justices Thomas, Rehnquist, and Scalia dissented because a thorough review of the common law persuaded them that Hobbs Act extortion under color of official right was not bribery: "The 'under color of office' element of extortion … had a definite and well-established meaning at common law. 'At common law it was essential that the money or property

58

be obtained under color of office, *that is, under the pretense that the officer was entitled thereto by virtue of his office*. The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority.'" *Id.* at 279 (Thomas, J., dissenting) (citations omitted). Thus, at common law, bribery and extortion were distinct and distinguishable offenses: "Where extortion is at issue, the public official is the sole wrongdoer; because he acts 'under color of office,' the law regards the payor as an innocent victim and not an accomplice. … With bribery, in contrast, the payor knows the recipient official is not entitled to the payment; he, as well as the official, may be punished for the offense. … Congress is well aware of the distinction between the crimes; it has always treated them separately." *Id.* (citations omitted).

In subsequent years, justices and commentators have continued to question *Evans* and its outgrowths, voicing concern that *Evans* defines Hobbs Act extortion too broadly. *See, e.g.*, *Silver v. United States*, 141 S. Ct. 656, 656-57 (2021) (Gorsuch, J., dissenting from denial of certiorari) ("Normally, extortion and bribery are treated as distinct crimes. In *Evans v. United*

*States*, … however, this Court conflated them for purposes of the Hobbs Act when a public official is the defendant. … I would have granted this case to reconsider *Evans* …."); *Ocasio v. United States*, 578 U.S. 282, 300 (2016) (Breyer, J., concurring) ("I agree with the sentiment expressed in the dissenting opinion of Justice Thomas that *Evans v. United States*, … may well have been wrongly decided."); Kate Stith, *No Entrenchment: Thomas on the Hobbs Act, the Ocasio Mess, and the Vagueness Doctrine*, 127 Yale L.J. Forum 233, 239 (2017) (discussing Justice Thomas's "prescient" dissent in *Evans* and concluding "[t]he bottom line: *Evans* was wrong").

*Evans* should be revisited.[7] It propounded an overly expansive and incorrect definition of extortion under color of official right. Based on a correct understanding of that term at common law, Hobbs Act extortion under color of official right occurs only where a public official wrongly obtains property from another under the false pretense that he is entitled to

---

[7] Counsel recognizes that *Evans* is presently binding precedent but raises this argument for purposes of preservation and further review.

that property by virtue of his office. Hobbs Act extortion does not reach

alleged bribery schemes involving public officials.

With this correct understanding of the law, the government's evidence

was insufficient to show that Goldstein or his codefendants violated the

Hobbs Act: the government alleged and sought to prove only a bribery

scheme—there was no evidence that Goldstein sought money or property

for himself under the pretense that he was entitled to it by virtue of his office.

Accordingly, the Court should reverse Goldstein's convictions on Counts

One and Two.

## V.    The district court's erroneous calculation of the "value" of any bribes warrants resentencing.

Even if this Court affirms Goldstein's convictions, he should be

resentenced. The district court erroneously considered the full amount of all

payments to RMSCO as the "value" of bribes to Goldstein for purposes of

the Sentencing Guidelines, notwithstanding the evidence that payments

went to third parties and covered RMSCO's legitimate business expenses.

This mistaken Guidelines calculation erroneously anchored the district

court's ultimate sentence, requiring vacatur.

**A.   This Court reviews the procedural reasonableness of sentences.**

This Court reviews sentences for procedural and substantive reasonableness. *See United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2018). A sentence is procedurally unreasonable if it is based on a "mistake in [the] Guidelines calculation." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). The Court further reviews "the district court's interpretation of the Guidelines" *de novo*, and reviews factual findings for clear error. *United States v. Lopreato*, 83 F.3d 571, 574 (2d Cir. 1996). The government bears the burden of establishing any increase to the Guidelines. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

**B.   The bribery "value" calculation should not have included RMSCO's legitimate expenses and amounts paid to third parties.**

The Guidelines applicable to Goldstein's offenses, U.S.S.G. §§ 2C1.1(a) and (b)(2), provide for a base offense level of 14, which is increased based on the "value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest …."

62

Section 2C1.1(b)(2) incorporates the table and methodology in U.S.S.G. § 2B1.1 to determine this value amount and the corresponding enhancement. Section 2C.1.1's aim is to make "the punishment … commensurate with the gain" actually received by a defendant. *See* U.S.S.G. § 2C1.1, background.

Here the district court opined that the value of payments to Goldstein was $96,670.39, the total amount received by RMSCO. JA.6329-30. This was error, because that amount indisputably included RMSCO's legitimate business expenses and amounts paid to third parties.

**1. The Guidelines provide for offsets based on legitimate business expenses of legitimate companies.**

Application Note 3 of U.S.S.G. § 2C1.1(b)(2) states that the calculation of the "value" of any bribe should only include "the net value of such benefit." Other circuits have recognized that the phrase "net value" contemplates offsets for the value of any "legitimate object or service of value" obtained by a challenged payment. *United States v. Pena*, 268 F.3d 215, 219-20 (3d Cir. 2001); *see also United States v. White Eagle*, 721 F.3d 1108, 1122 (9th Cir. 2013). As the Third Circuit explained, a "defendant may receive a credit for expenses he incurred while providing 'legitimate' services, 'even

63

amid [his] fraudulent conduct[.]" *United States v. Scarfo*, 41 F.4th 136, 213 (3d Cir. 2022) (quoting *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998)) (alterations in original).

This Court has recognized the same when calculating the "net value" of benefits under analogous Guidelines. In *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998), the Court found that the appropriate measure of an improper bribery benefit under U.S.S.G. § 2E5.1(b)(2) is "the net value of the benefit received, rather than the gross income received."

Thus, to accurately calculate the "net value" of bribes to a defendant under § 2C1.1(b)(2), courts should deduct any portion that was paid or otherwise put to legitimate services. *See, e.g.*, *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) (excluding payments to legitimate business enterprises from bribery value calculation); *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (noting that "[m]easurement of loss becomes considerably more complex" in the case of fraudulent payments to "an otherwise legitimate company" because the court must "disentangle" underlying legitimate payments and value generated).

### 2. RMSCO was a genuine company that made payments for legitimate business expenses and to third parties.

The trial evidence established that RMSCO was a legitimate business that incurred legitimate expenses. The government agreed, emphasizing that the defendants were "building a viable business" and that this business had "value." *See* JA.4766. Because RMSCO was a legitimate business, with expenses that were paid out to third parties, Goldstein was entitled to an offset of the Guidelines bribery "value" amount based on these expenses.

But the district court erroneously refused to make any offsets. For example, the district court included in its value calculation Somma's October 2015 payment to RMSCO. But there was no dispute that over $12,000 of those funds went to pay legal expenses incurred in setting up RMSCO and preparing its distribution agreements. Similarly, the government did not challenge that over $3,000 of Somma's payments to RMSCO were used to pay legal fees from negotiations with Polish beef suppliers over distribution agreements. There was also ample evidence showing that funds sent from Somma to RMSCO were to reimburse Goldstein for his travel expenses to meet with potential beef suppliers in Poland and Chile. Courts have

consistently held that these kinds of payments should be excluded from loss calculations, even if other portions of payments were in fact fraudulent. *See, e.g.*, *United States v. Avenatti*, No. 22-50301, 2024 WL 4553810, at *2 (9th Cir. Oct. 23, 2024) (offset for legal fees).

In refusing to deduct any of these legitimate expenses for purposes of the Guidelines calculation, the district court opined that "even though some of the monies went to legitimate expenses in terms of airplane tickets, et cetera, this was still a value to Mr. Goldstein because it was for the benefit of this new business." JA.6329-30. That misunderstood the issue. Even if all the payments to RMSCO had *some* value to Goldstein, the operative question was how much. And the record did not support the district court's conclusion that all payments to RMSCO were, dollar-for-dollar, illicit benefits to Goldstein.

## C. Because these offsets would lower Goldstein's Guidelines range, he should be resentenced.

The district court's erroneous "value" calculation was just over the $95,000 threshold in U.S.S.G. § 2B1.1(b)(1)(E). Therefore, subtracting any of the legitimate expenses noted above would reduce Goldstein's offense level

and meaningfully reduce his Guidelines range. As a result, the district court's error in miscalculating this "value" amount warrants resentencing.

Nor does the fact that Goldstein received a sentence below his erroneously calculated Guidelines range render this error harmless. "A district court that 'improperly calculat[es]' a defendant's Guidelines range … has committed a 'significant procedural error.'" *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016) (quoting *Gall v. United States*, 522 U.S. 38 (2007)). This Court has recognized that even when a sentence is below the Guidelines range, "any error in making the initial calculation of the applicable guideline range will normally undermine the validity of the resulting sentence …." *United States v. Confredo*, 528 F.3d 143, 150 (2d Cir. 2008). Just so here: "the miscalculated Guidelines range may well have anchored the District Court's thinking as to what an appropriate sentence would be." *United States v. Bennett*, 839 F.3d 153, 163 (2d Cir. 2016). Based on this miscalculation, Goldstein should be resentenced.

## CONCLUSION

The Court should vacate Goldstein's convictions or, alternatively, order resentencing.

Dated:     New York, New York
           February 5, 2025

                              Respectfully submitted,
                              Federal Defenders of New York, Inc.

                              By: __/s/ Sarah Baumgartel_____
                                 Sarah Baumgartel, Esq.
                                 Ashok Chandran, Esq.
                                 Attorneys for Eric Goldstein
                                 52 Duane Street, 10th Floor
                                 New York, New York 10007
                                 Tel.: (212) 417-8772
                                 Sarah_Baumgartel@fd.org

68

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served electronically on the United States Attorney/E.D.N.Y., Attention: **LAURA ZUCKERWISE, ESQ**., Assistant United States Attorney, 271-A Cadman Plaza East, Brooklyn, New York 11201.

Dated:    New York, New York
           February 5, 2025

/s/ Sarah Baumgartel
**SARAH BAUMGARTEL**
Assistant Federal Defender

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 12,037 words, excluding the parts of the brief exempted by Fed. R. App. P. 2(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Palatino Linotype** type style.

Dated:      New York, New York
            February 5, 2025


/s/ Sarah Baumgartel
**SARAH BAUMGARTEL**
Assistant Federal Defender